Our second case of the day is in appeal number 252935. Schukar v. Kenosha County, Wisconsin. Kate, nice to see you. May it please the court, Nate Cade appearing on behalf of the plaintiffs, Alyssa Schukar and Scott Olson. August 25th, 2020 was the third day of a disturbance in Kenosha. Protests as a result of a shooting of an individual by an officer. Law enforcement officers from dozens of jurisdictions working multiple bouts of overtime, one patrol. In particular, several officers were outside the Kenosha County courthouse, which was fenced in on all sides and surrounded by law enforcement. Two photographers that day, my clients were on assignment, one for the New York Times, one for Getty's covering the events. Law enforcement that day knew that a curfew existed and importantly, it did not exempt the press. The curfew actually started that day, right before my clients were injured. There are several points that I'd like to raise, but I want to make sure that we understand the point of view. First of all, the district court determined that it was apparent from the record that at least a jury could make a determination that these two particular defendants, the, the appellees were involved in terms of shooting. We know this.  Cade, I'm sorry, judge. There was a stipulation below and the district court didn't enforce it. And the stipulation was that your clients were standing on the Eastern side of a median and the defendants, where they were located, they could only direct their shots at targets that were on the Western half. If we enforce that stipulation, can you prevail? I still think we can prevail your honor, because that stipulation, all it says was what was visible. So if I'm holding a 40 millimeter launcher, it's very similar to having a propeller, right? It says that the, and I'm sorry to interrupt you, but the, your clients were standing on the Eastern part of the median when they were struck and defendants could only deploy rounds at targets located on the Western half because of the type and design of the window. So it's more than just what they could see it. It says they could only deploy rounds at targets on the Western half and your clients were on the Eastern half. So how can you prevail given that stipulation? Again, your honor, the, the Eastern half, they weren't all the way on the Eastern half of the median, according to judge Stapmiller and where he placed. I'm focused on what your stipulation, which was says that they were standing on the Eastern end of the median. Correct. But what I'm saying, judge is based on the record and what judge Stapmiller have with the stipulation, we know there's an overturned dumpster. We know that Olson is on the West side of that dumpster. We're not talking 50 feet judge. We're talking a distance of maybe 10 feet from the dumpster to literally the center edge of that median.  Cade, can I pick up on this dialogue? Yes, judge. Okay. I have the exact same concern about whether the district court did the district court basically displaced the stipulation. And I think you're right to focus on the, the one dumpster. Okay. But when I look at the deposition testimony of Mr. or it's Robicowski and officer Jacobs, they're both talking about other dumpsters. So what I'm getting at is in a world where there was one and only one dumpster and we knew of its location. I think your argument might have more traction, but it seems to me from the testimony, I mean, I can read it to you. You know, it, they talk about other, they talk about other dumpsters and it's not surprising because in the middle of this protest, which was very intense people and there were crowd control weapons being shot at the protesters. Actually, that's, that's not correct judge. And that's, that's the distinction. I know before suit was filed, we did an open records request. My clients, the photographers had images of all of these law enforcement officers. I did open records requests to find out who had expended ordinance. You don't just go to the store and buy these foam. No, no, no. Focus on the dumpsters for a second. What I'm saying judge is when we did the open records request, we knew which departments had fired five, 10, 15 rounds. So we knew the panoply during the day. Then we were able to focus through discovery who fired during this time. These are the only individuals who fired during this time. If there were other officers, other law enforcement that fired, the defense never put it forward. We never had evidence of anyone else doing it. So I understand. How does that help you if they're situated in a location where they couldn't have deployed the weapons at your clients? They, it's not that they couldn't deploy what they said, uh, is that where my clients were situated. There's the, no, they said defendants could only deploy rounds at targets located in the Western half and your clients were in the Eastern half. Again, if I'm focusing on that one dumpster, I know Olson is to the, uh, West of that dumpster. I think that takes you back to judge Scott. So can I, you're going to have argument time. Don't worry about it. Can you, can you just focus on the dumpster issue? Yeah. And the reason that it's, I'm not, I'm not trying to pay, you know, trivial facts here. The reason it's significant is because the district court placed emphasis on the dumpster. Okay. And in a world where there's only one dumpster out there and people were trying to protect themselves on one or another side of the dumpster. I think your argument is pretty decent. I really do. But in a world where we change those facts and we put multiple dumpsters out there because there are multiple protesters and all the protesters shared an interest protecting themselves. And there appear from the deposition testimony transcripts of the two officers that there are multiple dumpsters out there. That creates a problem for your, your clients, except they haven't identified the location of those. They haven't said, no, no, no. They have, they have, this is where they have, when you look at the, when you look at the deposition testimony and the accompanying maps that were marked of Jacobs and Roba Kowski, I don't see any, I don't see any way a jury could conclude that there's one and only one dumpster. And that dumpster possibly could have been on the East side of the property. I just, I don't see it as a possibility. And so then, then that that's problematic for you at summary judgment. And maybe you can, maybe you can correct my understanding of the record, but I mean, I, for me, this is what it turns on. I have the documents right in my hands. Sure. I don't think they specifically said there were four dumpsters and here's the location of all four dumpsters or three dumpsters they've indicated judge that they believe there were other dumpsters. However, we know that on the day of the shooting one, they didn't realize they had shot either of the plaintiffs. What they recalled from two years earlier, when they were deposed, my clients obviously know what was in proximity because it happened at that time. These officers, what they hit, neither one of them could account for all of their routes. The other issue is when you say Eastern and Western, again, we're not talking a huge swath of land. It's not hundreds of feet. So if I'm out, no, I know, but what do you do with it? I mean, for better or worse, and maybe in hindsight, they regret it, but what do you do with judge? I mean, judge, judge St. Eve is not making it up. I mean, she's reading from the stipulation.  I mean, what do you do about that? I think that's a, again, we never discussed, we said Eastern, Western, we never discussed what was in the center, but the Eastern doesn't say they're on the edge on the far edge of this strip, it's a narrow range. So whether, uh, Robichowski or Jacobs are off in terms of say on the Eastern end of the median, they said the Western end, no, your clients were standing on the Eastern end of the median and the defendants could only deploy rounds at targets located in the Western half. I know we have, that's a stipulation. Correct. I know we have deposition testimony. I know we have maps. People have identified where they were located. Um, the stipulation judge, part of that. Is consistent with the maps and where they were located. I don't, the, the, the maps that are in evidence don't conflict with that. Well, it would, if. It all comes down to the dumpster, I think. Well, Olson is, we know to the West of a dumpster, right? So you've got a dumpster that is not on the far East end. There's a dumpster there's Olson. So he's on the Western end of that. Whether Olson is standing five feet or 10 feet from that dumpster, we're still talking about the center of the median where that Western range is again. That's really a, I think a jury question of could these officers have hit them? We've done everything we could to find out who fired during a certain time period. And I don't doubt that it's just based on this record. Can you establish a burden of proof? That's what to get past summary judgment. That's what the question is. Well, I think the judge did indicate that based on the record and the documents that he reviewed, uh, judge Stettmuller did find that in fact, um, they were both personally involved that he did find that they had fired, um, with regards to their rounds. I do want to make sure that I use my time. We have two other issues. We have the first amendment issue and we have the fourth amendment issue. Yeah. I'm, we're going to give you time. Don't worry. Okay. Um, it's counting down here. So that's no, I know, but we can, we, we can control that clock. Believe me. Okay. Um, all right. I got a question for you before you move on to those points. Yes, judge. In the district court opinion, and I'm looking at page 23, you have it there. Uh, give me one second. I will pull it. I just want to better understand this from an evidentiary perspective and page 23. Yes. Your adversaries are welcome to address it too. In that top paragraph, there's a point made that the plaintiffs point out that one, the parties cannot identify any other law enforcement officers who deployed, et cetera. Okay. That's the point that you were making earlier, right? Okay. There's a difference though, between the parties on able to identify whether there were any other officers. There's a difference between that and definitively either of the two officers here, Robicowski or who is it? Jacobs. Yes. That they were the ones that in fact shot the, uh, whatever it is, foam bullets that they hit your clients. There's a, there's a distinction there. There is judge. But if you go back to the case from 1948 summers V Tice, where you have two hunters and an individual shot, and they're both saying, I didn't do it. The other person did it. And a court says you can, it's really a jury question because it goes to credibility. Who does the jury believe? They're both pointing the fingers. We've got these officers all said, I didn't shoot your clients. Well, if they can't account for the rounds, how do they know they didn't shoot them? That's pure speculation on their part. We can't identify. Is it part of the problem there that we don't even know what they were hit with that harmed them? We don't even know if it was one of these rubber or deployed, what was coming out of the time they're, they're, they're about yay big, about a palm size. So we don't even know the record does not reflect that anybody knows what they were even hit with as opposed to something that another protester could have been throwing possibly, except we know, for example, shoe car says when she was hit her, her left hand, she had her left hand on the camera, she's facing the courthouse. So what she was hit with, I think is the question. I don't, I didn't see anything in the record, including your client's own testimony that supported that there was evidence of what exactly they were hit on this hectic evening with lots of protesters throwing things.  But my, my point is where she was located, judge, if the courthouse is in front of her and she's got her hand on her camera and she's got protesters behind it, they're not hitting her in the hand, damaging her hand and, and her fingers are mangled. So it would have to be more than protesters just behind her, correct? There were, there's a decides, but that would mean that a protester rather than throwing something towards the courthouse would be throwing it towards the side, towards her or someone in front, turning around and throwing something at her, it's a possibility, but that's really for a jury hearing the evidence to make a determination. Is it more likely than not? It was a baton, a foam baton that hit her as opposed to something else. So when she got hit, she wasn't looking around saying what hit me. She was like, I got hit. She had already been hit by pellets. So she knew what those felt like and said it was definitely not a pellet. And the damage that was cost her hand likely wasn't a pellet. So could it have been a rock? It could have been a rock. Could it have been something else? It could have been, but at some point you can't turn around and say, well, since you can't show what it is, you're barred. That's what juries do. They make those factual determinations and we boil it down to, we know there's only two individuals firing that type of projectile during the time period the clients were shot.  Cade, you can, uh, you, I'm going to give you the four minutes of rebuttal. So you're welcome. You're welcome to use it now if you want to address the other points or you can hear what your adversary is saying. Come back up. I'll use one minute now, judge, but if they put the four up, I'll, okay. Yeah. Uh, I do want to address briefly the fourth amendment seizure issue. Um, judge Stattman there said that they were not seized and I disagreed. It talks about restraint of movement. Obviously, if you're shooting someone who is a press photographer, they are moving. You've restrained their movement. What my colleagues have suggested is that, well, it was unintentional, except neither Robicowski or Jacobs knew who they were shooting at. They both said, we didn't see they were press. The defense has made an argument while they weren't wearing press hats or anything. Uh, I know my client, um, shoe car was wearing goggles and a helmet. So if they're being shot at, you don't know if they're innocent. This is not a situation where, Hey, I know there's a hostage and I know there's a bad guy and I might hit the hostage. They don't even know that it's press that's there. And all of the cases that they cite when you're dealing with vehicles and everything else, they know, Hey, there's truly an innocent person and there's a bad person. As far as Robicowski and Jacobs know, it was all protesters. Doesn't that argument go against your first amendment claim? If you're saying they don't even know that the press is there. Well, the first, doesn't that go against your first amendment? Retaliation claim? No, because if they're shooting at individuals who are exercising their first men rights, whether I'm a protester or not, if I'm not doing anything like throwing a dangerous object, I still have my first amendment rights. The fact of the matter is they were wearing camera equipment. And the reason we emphasize that was the defense turned around and said, well, they're not wearing, you know, I'm sorry to interrupt, but is your first amendment claim tied to the fact that they're with the press or not? I thought it was, it is tied with the fact that they are the press, but if your argument on the fourth amendment is that everybody looked the same, nobody knew it was the press versus a protester. Doesn't that undermine your first amendment argument? There's, there's still first amendment judge, because if I'm a protester, if I'm just standing, it might be first amendment rights as a protester, but if your argument is your first amendment argument is tied to the fact that they're members of the press, they were members of the press who were not engaged in doing anything, but even if they were not members of the press, not, they still have a first amendment right to be present. I understand. Thank you. Okay. Thanks to you, Ms. Mills. Good morning. Good morning, Your Honors. May it please the court. I represent Appellee Robachowski. My colleague represents Appellee Jacobs, but because their positions are centrally aligned, we're going to split our time and I will cover the personal involvement aspect and I will cover the first amendment and Attorney Baynard will cover the fourth amendment and qualified immunity. It does seem to me as if the court has keyed in quite a bit on the personal involvement issue, which is something that stuck out to us from the district court's decision, particularly because the district court recognized, and this is in the appendix at 27, that its conclusion about personal involvement was, quote, contrary to the party's statement of undisputed facts and the fact that the court sort of diverged from that statement of undisputed facts, which is sort of a unique procedural requirement for this particular judge, made it impossible for the appellees to really address any of the judge's conclusions and kind of point out why those were. Do you want to address the dumpster argument? So the dumpster argument, as you said, there is evidence in the record. This is not the only dumpster. There were dumpsters everywhere. The issue with the locations and hopefully the court found it somewhat helpful with the photographs within the briefs showing where people are located. At page 20 of our brief, there is a diagram showing with a red star where Ms. Shukar was located when she was struck. And these diagrams were based on the deposition testimony. We just tried to make them a little bit clearer for purposes of the brief. That's where Ms. Shukar was when she was struck. And on the following page, page 21, that is a diagram showing where Mr. Olson was located, where he was struck, the yellow star and then the orange square being the dumpster that he was photographing protesters by. As the court has noticed, it is in the record document 69. That's the party's undisputed facts stipulated to the fact that Jacobs and Murkowski, from where they were stationed, could only deploy rounds at targets located in the Western half of that area. So when you look at these two images, I don't see how there could be any possible reasonable inference if you just draw a line and even give a little bit of benefit of the doubt and move it slightly east a few feet, how with that stipulated fact, anything that those two officers deployed from the courthouse could have ultimately hit those two individuals. Was the evidence that the dumpster here, and I'm at page 21, the orange square, was the evidence that the dumpster was to the east of the plaintiff? It was to his east, yes. So the east, you go a couple of blocks more, that's Lake Michigan. You've got Sheridan Road is the easterly border, and then you've got 56th Street. That dumpster, I think he testified, was maybe 10 feet from it. There was a group of protesters. To his right, or to his east? He was to the west of it. It was to his east, yes, sorry. And he was photographing protesters who were using it as a shield. But the other point that I think that the court also pointed out, and I think it was Judge St. Eve towards the end there, was that it's undisputed that neither plaintiff knows what hit them. This is a chaotic situation. It's also undisputed that there's a large crowd in this median area, but also in the park behind them, but also in front of them, who are launching bricks. They're launching rocks. They're launching mortar-grade fireworks at these officers. There's things flying in the air. But neither plaintiff saw what struck them. They've conceded they don't know what hit them. They looked around on the ground immediately after being hit, didn't see anything that looked as if it had hit them, certainly not any foam batons. They never saw any law enforcement officer point an object at them. Ms. Mills, can I take you back to part of the colloquy I was having with Mr.  And I just want to get the benefit, you all litigated this, or some of your colleagues did. I want to get the benefit of your understanding of that point that I am referencing in the district court decision, that the parties can't identify any other law enforcement officers. What's your understanding of... That is amenable to a lot of different interpretation. What's your understanding of what the record shows on this? So the record shows, and I think it's indicative of the fact this happened in Kenosha County, Wisconsin. And Mr., or Officer Robachowski was from the Waukesha County Sheriff's Office. Officer Jacobs was from the Village of Della Field Police Department. This was the third day of protests that were nationally, internationally televised. There were hundreds of law enforcement officers who came from almost every county in the state of Wisconsin. Robachowski and Jacobs in particular happened to be part of a multi jurisdictional unit from a completely different county who came. So I don't think that it would be reasonable, even through one or two open records requests, or even to half the counties in the state of Wisconsin, to be able to say definitively, these are the only individuals who were equipped with something capable of launching foam batons, or the only ones who did. We have no idea how many, there's nothing in the record that shows all of the other, the National Guard was there, the FBI was there. This is why I'm asking the question, because in a hypothetical world, which would be in a completely different galaxy than I think is with what transpired here, if Robachowski and Jacobs were the only two, the only two, law enforcement officers in that courthouse at the time, this is a totally different case for Mr. Cade's clients. I can't imagine that that's even remotely true, that there had to have been hundreds of law, it was bordering on a riot. Yes. So you make the point, there was a defendant in this case. So the fact that the parties can't identify the others, I kept wondering when I read that, well, is that because the records are bad? Is that because there were hundreds of others? I don't know what that means. So I can give you one concrete example of another officer who was there, Brian Doe, he was a defendant in this case, the claims against him were dismissed ultimately, I can't remember if it was before summary judgment or stipulated. He was on the roof of the courthouse. He had a weapon that could deploy pepper balls. Now I know that Ms. Shukar thinks it wasn't possibly a pepper ball, but again, they don't know what hit them. There were officers there who were equipped and the record shows with things that could deploy all sorts of different types of weapons. It's that these two individuals have both stated they are certain for whatever reason, that they were struck by foam tipped 40 millimeter baton rounds. That's what they say. I'm sure it wasn't anything else. That's what it was. But yes, there were officers and the record shows that one of them being Brian Doe, who was a defendant, who were equipped with things who could deploy various types of projectiles. He was stationed. He happened to be overwatched on the roof of the courthouse at the exact same time that all of this was happening. And I see I'm out of time. I don't want to take my colleague's time. So if you have any questions. Okay. Very well. Thank you, Ms. Mills. Good morning. Good morning, your honors. May it please the court. Attorney Jazmin Bader on behalf of Appellee Delafield police officer Ryan Jacobs. I want to start with the court's question about the finding the district court made on page 23 and with regards to the plaintiff's claim that he was struck by   not being able to tell what hit them, who hit them. And as the court pointed out, there was likely other, I guess, agencies that were there on figure two. So page 18 of our brief, there is a picture, an actual picture from the cameras that were coming from the courthouse. And it shows, just gives you a little bit of an example of the amount of law enforcement that were just in one area. I think that when we're dealing with this case and really the issue in the judge, you pointed out, and I won't belabor it, is that we're not just dealing with an issue of, oh, this is a credibility determination a jury should decide. The plaintiffs have no evidence for which a reasonable jury could decide anything from. And truly the district court kind of did them a favor by one, there's a process by which in order to file summary judgment, you have to stipulate to facts. And so this idea, I think you correctly pointed it out, that saying, we don't know what hit them. They don't know what hit them. And it was almost like the burden was placed back on us then to say, well, there's national guard. We don't represent the national guard. They were, you know, they were called in separately. Tell us who hit them. Take it from a different perspective though, because we have to look at the evidence, right, in the light most favorable to the, to the journalists here. It's very odd for a plaintiff to, or you just don't see it every day, for a plaintiff to stipulate themselves out of their own case. We don't see that all that often.  And you're, Mr. Cade is a very talented lawyer. These are very accomplished journalists for very reputable organizations. It's odd that they would just say, well, we're going to stipulate, we filed a lawsuit, but we're going to enter into a stipulation and our case is going to go away. So I observed that only to suggest, might there not be enough ambiguity in the overall fact pattern here about what happened to underscore Mr. Cade's point that we should send it to a jury and all that's what juries are for. Your honor. I would, I would disagree that this is a case that should go to the jury. What I think happened is these individuals were struck by something. I think that it was likely a brick or just based off the injuries, I saw a brick or something throwing by a protester. I think that's just as likely the idea that we should, this should, there's, there's not enough ambiguity in the record because one, the plaintiffs can't say who hit them and the two remaining defendants could not have done it. So while I think your question was, well, how we don't see this, right? It seems that the plaintiffs. You're right. It's the latter point that's important. It could not have done it. It could, it could not have been because the one person had their head cracked open. Yes. Um, I think it was the man, right? Yes. About, I mean, that's a, that's a serious injury. Agreed. And a foam, I mean, a foam baton and getting in kind of the semantics of how these launchers work. Um, I mean, again, that's not in the record. I don't want to spend time about how the injuries could have occurred. It's that there is not enough ambiguity in the record that should make this go to a jury. It can't, because what would we present to a jury? These officers are going to say, we did not fire at those individuals. Those individuals are going to get up there and say something hit us and we don't know what it is. And so kind of moving away from this. I mean, cause I want to touch on, I think I can draw this into the fourth amendment analysis. Let's assume, let's go for you do that back to the timing of the stipulation. It was an advance of summary judgment and there were multiple defendants involved at that time that there may not have been a focus on just these two when those stipulations were made. I think that's part of it. I also think when the lawsuit was filed and the information that came after it, and I mean, I'm not going to, I'm not going to speculate as to the plaintiff's motivations, attorney Cade's motivations to keep the lawsuit moving, but it became very clear to us when we did this executive summary that there was this very fatal evidentiary flaw. However, in sad Miller's court, you have to come to this set of facts or, you know, there can be repercussions. So we came to the set of facts and, and I want to move to this fourth amendment issue because even if we assume, let's assume they could say what hit them, let's assume it was even a possibility that it was a launcher from fired from the second floor of the courthouse. Their fourth amendment claim still fails because they can't prove that. And again, I'm assuming that a seizure occurred, that the seizure was unreasonable. And we've kind of framed this and this isn't the first protest case I've had. We framed this as protest. It was not a protest. It was civil disobedience, borderline riots, what were going on. These officers were deployed and in charge, tasked with kind of protecting other people, protecting everybody that was there. And when the testimony in the record is that, and the case law requires an intentional force directed at a person allegedly that that's being seized, an accidental seizure is not a seizure. And to the point of the reasonableness under the circumstances, Shukar and Olson's testimony supports that there are protesters there throwing, I think Olson says right before he has hit a firework at a line of police officers. So even if the officers did, they were accidentally hit under the circumstances and what the officers were responding to, the seizure would have been reasonable. They are trying to disperse crowds that are throwing fireworks, bricks, glass bottles. Is that a jury argument? I don't I don't necessarily think so, because under Graham v. Conner, a court can look and if you just look at what's in the record, Olson and Shukar's testimony both supports the dangerousness of what was going on. The extensive video record supports the dangerousness of the circumstances. The officer's testimony supports the dangerousness of the circumstances. And so I think if we're looking at this of a, well, why would they plead themselves out of court? That's a, that's a great question. But if we want to make that assumption, we want to give them that inference. We want to take another leap and to say that, you know, I think, you know, my miss our motivation, I think, to, to both the first and the fourth amendment claim. There's absolutely no evidence of that. These individuals said we were members of the press and then you see them shift kind of in their brief and observers or photojournalists or we're documenting. So if you were not engaged in any behavior that was unsafe, you weren't throwing anything, these officers were not targeting you. And while, uh, while the officers testified that I don't know exactly who I struck, they were able to identify the targets. It was just the, the numbers and where they occurred. And that was, uh, I guess one of the points I wanted to address because this idea that the burden got put back on us, like, we don't know what happened. Defendants, you figure out what happened. And I think, you know, be here. How do you think horses, not zebras? I think they probably just weren't hit by these two individuals. And thank you. You're quite welcome.  Cade, you have some time left. You're welcome to use it. Thank you, judge. Uh, I'll quickly go through a few points. First of all, um, the national guard was not at the courthouse. They were in Kenosha. They weren't at the courthouse. There was another municipality, Franklin. They sent two police officers. I had photographs showing they were there open records. Hey, we were doing traffic two miles away. Kenosha also was in charge. So the, the, the sheriff of Kenosha was responsible. The national guard didn't take control. It was Kenosha. So they would know where people were deployed. Who was at, we did this records request to 15 different municipalities, including the national guard. They didn't fire foam batons. Second, um, these officers are all wearing uniforms that are all similar. They don't have something in blaze and saying, I am Kenosha. I'm Waukesha. They they're wearing badges or small things with helmets. The distance with regards to the questions, judge saying that you put the distance, we're never measured. We never had, and we never had was a line of sight for Robicowski and Jacobs as to what could they see? Are they inside the room firing and they can only see, or are they able to lean out the window and fire Robicowski in his testimony doesn't identify additional dumpsters. And importantly here, the appellate issue or the issues that were raised, the defense never appealed the issue of personal involvement. I, I gotta correct you on that. That I, this whole thing for me turns on this dumpster issue. There's a question asked on page 60 of his deposition. Okay. Do you remember seeing anybody hiding behind dumpsters, et cetera? Answer? Yes. There were people inside and hiding behind dumpsters.  What day judge, what day? He wasn't asked which day do you remember? Again, it was over three days. What were the dumpsters coming and going by day? They were literally, the people were taking the dumpsters from other areas and moving them in that direction. Is there, who testified to all that? Where can I find it? Where can we find factual accounting of what's going on with the dumpsters? I don't know if that's in the record judge. I know it was multiple days. All three days they were protesting because the, because the, the existence of dumpsters, plural creates, it creates a locational challenge. It does, but it also, he doesn't identify the day of the dumpsters. He just says, did you see dumpsters? We didn't get into the issues of whether they fired on August 23rd or fired on August 24th. That never arose. It was only what was fired on the 25th. So I follow you. You, did you have a final point you wanted to make? I interrupted you. I did. The final point is my colleague mentioned accidental firing into the crowd is not a seizure. We've cited case law, both from the ninth circuit. Um, and I think it was the 10th circuit, Colorado that says that's actually not the case. They do believe that is a seizure. We asked the court, uh, reverse the district court and send this to trial. Thank you. Okay. Mr. Cade, many thanks to you, Ms. Mills, Ms. Um, we really appreciate the sound advocacy here. Uh, we'll take the appeal under advisement.